IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| SAMANTHA D.,[1] | ) | |
|     Plaintiff, | ) | Civil Action No. 5:21-cv-000069 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) |        United States Magistrate Judge |
|     Defendant. | ) | |

Plaintiff Samantha D. asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that the Commissioner's denial of benefits is supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

1

2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[2] Social Security ALJs follow a

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

This is Samantha's fourth time applying for disability benefits. *See* Administrative Record ("R.") 115. She filed the underlying DIB and SSI claims in May 2019.[3] R. 312–19. She alleged that she became disabled on September 3, 2017, because of major depressive disorder, anxiety, neuropathy, folate deficiency, and a fractured ankle. R. 114, 132. Samantha was thirty years old, or a "younger person" under the regulations, on her alleged onset date. R. 132; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied those claims initially in October 2018, R. 110, 112, and upon reconsideration in February 2020, R. 156–86, 188. In March 2021, Samantha appeared with counsel and testified by telephone at an

---

[3] Samantha's two most recent prior claims were denied upon initial review by the state agency on April 24, 2018, and September 26, 2018, respectively, *see* R. 115, but those denials did not result in a "final decision of the Commissioner made after a hearing," 42 U.S.C. § 405(g), holding that Samantha was not disabled on or before either date. *See generally Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019); 20 C.F.R. §§ 404.900, 416.1400. Accordingly, the Commissioner's final decision denying Samantha's underlying DIB and SSI claims addresses the period from September 3, 2017, Samantha's alleged disability onset date, to June 4, 2021, the date the ALJ issued his decision on the underlying claims. *See generally* R. 36–49.

administrative hearing before ALJ Matthew Gordon. *See* R. 62–93. A vocational expert ("VE") also testified. R. 88–92.

ALJ Gordon issued an unfavorable decision on June 4, 2021. *See* R. 34–51. He found that Samantha had the following "severe" medically determinable impairments ("MDI") throughout the relevant period: right-ankle fracture and status-post hardware removal; neuropathy; obesity; adjustment disorder; major depressive disorder; anxiety; and post-traumatic stress disorder ("PTSD"). R. 37. He also noted that Samantha had "alleged disability and the record contain[ed] several references to [a] diagnosis . . . or history of fibromyalgia," but he found that the "extensive medical record" contained "no evidence" either that Samantha exhibited signs or symptoms associated with that condition or that her "medical doctors ha[d] ruled out other impairments," as the Commissioner's rules require. *Id.* (citing SSR 12-2p, *Evaluation of Fibromyalgia* (July 25, 2012)), *available at* 2012 WL 3104869). Thus, ALJ Gordon found that Samantha's alleged fibromyalgia was not an MDI. *Id.*

None of Samantha's severe MDIs met or medically equaled a relevant Listing. *See* R. 20–21 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.17, 11.14, 12.04, 12.06, 12.15). As part of his Listings analysis, ALJ Gordon found that Samantha's severe PTSD, adjustment disorder, major depressive disorder, and anxiety caused "moderate difficulties" in her overall abilities to interact with other people; to maintain concentration, persistence, or pace; and to adapt or manage herself; and "no difficulties" in her overall abilities to understand, remember, or apply information. R. 38; *see* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(E)–(F) (discussing the "paragraph B" criteria). He did not cite any supporting evidence or otherwise explain how he chose those ratings. *See* R. 38 ("Finally, the [ALJ] notes that no State agency psychological consultant concluded that a mental listing is met.") (citing R. 112–23, 141–42, 164–65, 185–86).

4

Rather, he simply noted that his ratings were "supported in detail in finding five," *id.*, which sets out his findings as to Samantha's residual functional capacity ("RFC"). *See* R. 45, 47–49.

ALJ Gordon found that Samantha retained the RFC to perform "sedentary" work[4] except she could "frequently" balance and "occasionally" stoop, kneel, crouch, crawl, or climb ramps or stairs, but never climb ladders, ropes, or scaffolds and "must avoid hazards" like unprotected heights and dangerous machinery. R. 38. ALJ Gordon also limited Samantha to only "occasional contact with supervisors and coworkers," but "no contact with the public either in person or remotely," "few if any changes in work setting," and "no work at production rate pace, meaning no assembly line work."[5] *Id.* This RFC ruled out Samantha returning to her past work as a customer service representative. R. 49 (citing R. 88–89). Based on the VE's testimony, however, ALJ Gordon found that Samantha still could perform certain "sedentary unskilled" occupations

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools," 20 C.F.R. §§ 404.1567(a), 416.967(a), and generally requires sitting for about six hours, and standing/walking for about two hours, during an eight-hour workday, *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002). *See* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). Younger "[i]ndividuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations," *id.*, but they are not presumed disabled unless they are also "illiterate or unable to communicate in English," *see* 20 C.F.R. pt. 404, subpt. P, app. 2 §§ 201.00, 201.17–201.29. ALJ Gordon found that Samantha could perform the physical demands of sedentary work, R. 38, and that she had "at least a high school education," R. 49. Samantha does not challenge those findings on appeal. *See generally* Pl.'s Br. 17–38, ECF No. 15.

[5] This RFC finding does not expressly address Samantha's remaining ability to work at a particular skill level. R. 38, 88–89; *see* 20 C.F.R. §§ 404.1568, 416.968 (skill requirements). Later in his decision, ALJ Gordon indicated that the RFC finding also limited Samantha "to understanding, remembering, and carrying out only *simple routine* tasks," R. 47 (emphasis added), which would be consistent with "unskilled" work, 20 C.F.R. §§ 404.1568(a), 416.968(a); *see Mascio v. Colvin*, 780 F.3d 632, 637–38 & n.7 (4th Cir. 2015). "'Unskilled work' is a term of art, defined by regulation as 'work [that] needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). "The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56847, at *4 (Jan. 1, 1985).

(weight tester, addresser, document preparer) available in the national economy.[6] R. 50 (citing R. 88–90). Thus, ALJ Gordon concluded that Samantha was not disabled at any time between September 3, 2017, and June 4, 2021. *See* R. 51. The Appeals Council declined to review that decision, R. 1–4, and this appeal followed.

### III. Discussion

Samantha challenges the Commissioner's denial of benefits on three grounds, each of which relates to ALJ Gordon's RFC determination. *See generally* Pl.'s Br. 17–26 (*Mascio* error in mental RFC assessment); *id.* at 26–32 (failure to consider leg pain and swelling in physical RFC assessment); *id.* at 32–38 (mischaracterizing daily activities in evaluating symptoms). First, she argues that ALJ Gordon did not explain how an RFC limiting Samantha to "occasional contact with supervisors and coworkers," but "no contact with the public," "few if any changes in work setting," and "no assembly line work," Pl.'s Br. 18 (citing R. 38), reflects the ALJ's finding that Samantha's severe mental MDIs caused overall "moderate difficulties" interacting with others; maintaining concentration, persistence, or pace; and adapting or managing herself, *id.* (citing R. 21). *See generally id.* at 21–24 (discussing *Mascio*, 780 F.3d at 637–68). Second, Samantha argues that ALJ Gordon "never made specific findings" about whether her physical MDIs and symptoms, including severe leg pain and swelling, "would result in a need to take breaks during the day or would result in an unacceptable number of absences from work" while she elevates her legs. *Id.* at 27 (citing R. 48); *see generally id.* at 26, 29–31 (citing R. 76–78, 642, 649, 651, 931–32, 969, 1317). Third, she argues that ALJ Gordon's evaluation of Samantha's

---

[6] ALJ Gordon found that these jobs were skill level "SVP 2," R. 50 (citing R. 89–90), "which would be consistent with 'unskilled work' under the Commissioner's regulations," *Nichols v. Colvin*, 100 F. Supp. 3d 487, 511 n.5 (E.D. Va. 2015) (citing 20 C.F.R. § 404.1568(a)). *See* 20 C.F.R. §§ 404.1568(a), 416.968(a); *Nichols*, 100 F. Supp. 3d at 511 n.5 ("Each job identified in the DOT has a specific vocational preparation ('SVP') time. . . . [A]n 'SVP 2' indicates that anything beyond short duration up to and including 1 month is needed to learn the job." (quotation marks omitted)).

symptoms is fatally flawed because he improperly considered the type of daily activities that she could perform without also considering the very limited extent to which she performed them. *See id.* at 33–35 (citing R. 75, 77–78, 407–13). And, even if the ALJ characterized Samantha's daily activities fairly, he did not explain how those activities supported his implicit conclusion that she could work outside the home for eight hours a day, five days a week. *See id.* at 33, 35–37 (citing R. 47–48).

Each argument has some merit. To start, ALJ Gordon's failure to cite *any* evidence or otherwise explain why he found that Samantha's severe mental MDIs caused "moderate difficulties" in her overall abilities to interact with other people; to maintain concentration, persistence, or pace; and to adapt or manage herself, R. 38, violates the Commissioner's "special technique" for evaluating mental impairments.[7] This technique instructs that the ALJ's written "decision *must* show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the

---

[7] ALJs use a "special technique" to identify functional limitations caused by a claimant's mental MDIs and related symptoms. *See* 20 C.F.R. §§ 404.1520a, 416.920a; *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017). At steps two and three of the five-step disability determination, the ALJ must "rate the degree" to which the claimant's mental "impairment(s) interferes with [his or her] ability to function independently, appropriately, effectively, and on a sustained basis" in "four broad functional areas. . . . : Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. §§ 404.1590a(c)(2)–(3), 416.920a(c)(2)–(3). The ALJ rates the claimant's overall degree of limitation using a five-point scale (none, mild, moderate, marked, and extreme), with the "last point on the scale represent[ing] a degree of limitation that is incompatible with [an] ability to do any gainful activity." *Id.* §§ 404.1520a(c)(4), 416.920a(c)(4); *see* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c)–(e) ("Moderate limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair[;] Marked limitation. Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited[;] Extreme limitation. You are not able to function in this area independently, appropriately, effectively, and on a sustained basis."). The ALJ's ratings, as well as his reasons for choosing them, also play an important role in a proper RFC determination, which is a more "holistic and fact-specific evaluation" of the claimant's ability to work for eight hours a day, five days a week despite his or her medical impairments. *Patterson*, 846 F.3d at 659; *see also Mascio*, 780 F.3d at 637–40.

mental impairment(s)" at step two, 20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4) (emphasis added), and in "comparing the medical findings about [any severe] impairment(s) and the rating of the degree of functional limitation to the [paragraph B] criteria of the appropriate listed mental disorder" at step three, *id.* §§ 404.1520(d)(2), 416.920(d)(2). An ALJ's "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review." *Patterson*, 846 F.3d at 662.

ALJ Gordon rated the degree of Samantha's functional limitation in each broad area, R. 38, but his decision "contain[s] no specific citation to the evidence nor any explanation of the ALJ's reasoning" in choosing those ratings, *Barnhart v. Colvin*, Civ. No. 16-629, 2017 WL 748974, at *6 (D. Md. Feb. 24, 2017) (reversing and remanding for same ALJ error); *see also Chandler v. Comm'r, Soc. Sec. Admin.*, Civ. No. SAG-15-1408, 2016 WL 750549, at *2 (D. Md. Feb. 24, 2016) (same). To the extent that ALJ Gordon relied on certain evidence cited in his later RFC assessment to "support[]" those ratings, R. 38; *see* R. 45, 47–49 (citing R. 122, 128–29, 164, 170–71, 581, 708, 757), he "never explained how he concluded[,] *based on this evidence*[,]" *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018), that Samantha had limited, but generally "fair" ability to function in each area, 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(F)(2)(c). *See, e.g.*, *Barnhart*, 2017 WL 748974, at *6. That evidence includes the DDS psychologists' shared opinion that Samantha's mental MDIs caused no specific work-related limitations sustaining concentration, persistence, or pace, R. 128–29, 170–71, which contradicts both ALJ Gordon's "moderate" rating at step three, R. 38, and his subsequent RFC finding that Samantha cannot "work at production rate pace," *id.*; *see* R. 47; *see also* R. 45 (concluding that "normal" findings on Samantha's mental-status exams "support[s] an ability to carry out various tasks [and] maintain attention[,] concentration, and pace"). Thus, "it is unclear whether that opinion, alone

8

or in conjunction with other evidence, formed the basis for the ALJ's determination." *Barnhart*, 2017 WL 748974, at *6. Nor is it clear "how the ALJ reached [his] particular conclusion" about production-rate work or whether excluding all assembly-line "work[] is consistent with a moderate limitation in concentration, persistence, or pace," *Chandler*, 2016 WL 750549, at *2 (quotation marks omitted). *See, e.g.*, *Barnhart*, 2017 WL 748974, at *3, *6 (reversing and remanding where ALJ found claimant had "moderate" limitations maintaining concentration, persistence, or pace and RFC restricted claimant to "work that does not requires satisfaction or production of pace"); *Chandler*, 2016 WL 750549, at *2 (reversing and remanding where ALJ found claimant had "moderate" limitations maintaining concentration, persistence, or pace and RFC allowed claimant to be "off task 5% of the workday"). It is the ALJ's responsibility "to clearly articulate the reasons for his [ratings] in each of the functional areas" at step three, *Barnhart*, 2017 WL 748974, at *6, and to adequately explain how those ratings logically relate "to his eventual RFC assessment, to ensure that the findings are consistent and well-documented," *Chandler*, 2016 WL 750549, at *2.

*

Samantha's other arguments relate to ALJ Gordon's evaluation of her physical RFC. *See generally* Pl.'s Br. 26–38. A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments and symptoms.[8] SSR 96-8p, 1996 WL 374184, at *2

---

[8] An ALJ's conclusion that the claimant's RFC renders her "not disabled" will, by definition, "implicitly contain[] a finding" that the claimant is mentally and "physically able to work an eight hour day" five days a week. *Hines*, 453 F.3d at 563 (citing SSR 96-8p, 1996 WL 374184, at *1); *see, e.g.*, *Elgie B. v. Saul*, Civ. No. TMD-19-847, 2020 WL 2490106, at *6 (D. Md. May 14, 2020). The ALJ's failure to expressly evaluate the claimant's remaining ability to "perform certain functions . . . for a full work day" or work week, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015), may be reversible error if it frustrates meaningful judicial review. *See, e.g.*, *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016) (reversing in part because the ALJ "never made specific findings about whether Monroe's [severe] apnea or narcolepsy

9

(July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. The ALJ's written decision "must include a narrative discussion" describing how specific, relevant evidence "supports each conclusion" in the RFC assessment, *Woods*, 888 F.3d at 694 (quotation marks omitted), and logically explaining how the ALJ weighed other "evidence that points to a claimant's disability," *Stoker v. Saul*, 833 F. App'x 383, 386 (4th Cir. 2020) (citing *Lewis*, 858 F.3d at 869). Generally, a reviewing court will affirm the ALJ's RFC findings when he or she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]" that the claimant is not disabled, *Woods*, 888 F.3d at 694. *See Thomas v. Berryhill*, 916 F.3d 307, 311–12 (4th Cir. 2019). Conversely, a reviewing court that "cannot gauge the propriety of the ALJ's RFC assessment [typically] cannot say that substantial evidence supports the [Commissioner's] denial of benefits." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662 (4th Cir. 2017).

"Symptoms," or the claimant's own description of his or her medical impairment(s), 20 C.F.R. §§ 404.1502(i), 416.902(n), play a crucial role in a proper RFC determination, *Mascio*, 780 F.3d at 639–40. The regulations set out a two-step process for evaluating symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. §§ 404.1529, 416.929. "First, the ALJ looks for objective medical

---

would cause him to experience episodes of loss of consciousness or fatigue necessitating breaks in work and if so, how often these events would occur").

10

evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant," *Craig v. Chater*, 76 F.3d 585, 594, 596 (4th Cir. 1996). Second, assuming the claimant clears step one, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565. This second step "requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all relevant evidence in the record, 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility finding if his or her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

"ALJs may consider the claimant's daily activities" when "evaluating the intensity, persistence, and limiting effects of a claimant's symptoms." *Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83, 99 (4th Cir. 2020) (citing 20 C.F.R. § 404.1529(c)(3)(i)); *see generally* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). But an "ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them." *Woods*, 888 F.3d at 694. Thus, an ALJ who finds that the claimant's subjective complaints of pain or other symptoms are inconsistent with the claimant's daily activities must "build an accurate and logical bridge" from the relevant evidence to that conclusion. *Arakas*, 983 F.3d at 100. The ALJ

11

must also explain how the claimant's daily activities show that she can "persist through an eight-hour workday" five days a week. *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017); *see Arakas*, 983 F.3d at 100–01.

\*\*

Samantha alleges that she became disabled on September 3, 2017, because of major depressive disorder, anxiety, neuropathy, and a fractured ankle. Treatment records show that Samantha stepped on a toy while getting out of bed on September 2, 2017. *See* R. 589. "She had a significant fall with rotation," R. 591, and thought that she "twisted" her right ankle, R. 589. X-rays showed closed right ankle fracture with dislocation, right syndesmosis disruption, and proximal right fibular shaft fracture. R. 591. The next day, Samantha had an open reduction internal fixation ("ORIF") of her right ankle, which was "markedly unstable" going into surgery. *Id.*; *see also* R. 592 (noting the "complexity and magnitude" of Samantha's injury). She had three more surgeries on that ankle over the next several months—a routine procedure to remove the syndesmotic screw in November 2017, *see* R. 615, which resulted in "recurrent syndesmotic diastases," R. 617; a "complex revision of the syndesmotic injury" in December 2017, which subsequently failed, R. 639; and another hardware removal in April 2018, *see* R. 647.

Samantha's orthopedic surgeon, Matthew Weresh, M.D., kept her in a Controlled Ankle Motion ("CAM") boot and either "partial weightbearing" or "strict nonweightbearing status" from September 2017 through mid-March 2018. R. 609, 611, 613, 617, 619, 629, 638–39, 641–42, 644; *see also* R. 502 ("She was non weightbearing for 9 months until about 3 months ago.") (Sept. 25, 2018). He also instructed her to ice and elevate her ankle to help manage the pain and swelling. *See generally* R. 609, 611, 613, 617, 619, 629, 638–39, 641–42, 644. On March 12, 2018, Dr. Weresh instructed Samantha to start putting full weight on her right foot and transition

12

out of the CAM boot into normal shoes. R. 645; *see* R. 502 ("She has recently been released to normal activity.").

In April 2018, Samantha told Timothy Wahl, Ph.D., that her "difficulties completing even basic ADLs," i.e., activities of daily living, were among "myriad situational stressors in her life" at that time. R. 1114 (Ex. B25F). Even after three ankle surgeries, "she continue[d] to experience pain and decreased mobility, and she was in a wheelchair as recently as two weeks" earlier. R. 1113; *see* R. 644–45. "Due to decreased activity, she ha[d] gained close to 100 pounds" in five months. R. 1113; *see also* R. 502 ("She noted 150 lb weight gain since fracture one year ago."). That May, Samantha told Dr. Weresh's physician's assistant that she was "transitioning from her CAM boot back to her normal shoes" and did "not have much ankle discomfort" at the time, although she had "noticed some swelling." R. 647. The PA instructed Samantha to "work herself back into normal footwear weightbearing as tolerated" and noted that she "may continue to progress her activities." *Id.*

In July, Samantha told Dr. Weresh that she was "walking a lot to try to help with her weight loss" over the summer. R. 649. She had lost 10 pounds, but her ankle was "getting increasingly sore and more swollen." *Id.* Dr. Weresh opined that Samantha's "walking activities [were] most likely too much too early" at that phase of her post-operative rehabilitation. *Id.* He recommended that Samantha wear the CAM boot and use one crutch to get around for the next few days. *Id.* Samantha could "resume some walking" when "comfortable" to do so, but he also "recommended lower impact activity for her weight loss goals." *Id.* Samantha continued to report lower-extremity pain and swelling, generally worse with activity, throughout 2018 and 2019. *See* R. 502 (Sept. 2018); R. 651 (Aug. 2018); R. 688 (Oct. 2019); R. 739 (Nov. 2019).

13

In June 2019, Samantha completed an Adult Function Report ("AFR"), R. 372–78 (Ex. B4E), and Pain Questionnaire as part of her DIB and SSI claims, R. 383–85 (Ex. B5E). She reported constant "sharp, aching" and radiating pain in both legs and feet. R. 383. Elevating her feet helped the swelling, but not the pain. R. 384. She could stand and walk "for a few minutes." R. 385; *see also* R. 376. On a typical day, Samantha got her kids breakfast, "cleaned the house with the help of [her] kids," started the laundry, made lunch, took the kids outside, made dinner, and got "the kids showered and to bed." R. 385; *see also* R. 372. Samantha was a single mother to her five school-aged children. R. 372; *see* R. 579 (reporting five children, ages four to thirteen years old in August 2019). She made "all kinds of food for [her] kids" three or four times a day, and it typically took her one or two hours at a time. R. 373. She needed help putting food in the oven. *Id.* She also needed help transferring wet clothes from the washer to the dryer. *See id.* The kids "usually" did their own chores. *Id.* Pain in Samantha's legs and feet made it "almost impossible" for her to play with her kids. R. 375. She shopped for groceries in stores or online "2–3 times a month." R. 374. She did not go anywhere on a regular basis. *See* R. 375.

Samantha's mother, Jill, completed a Third-Party AFR in June 2019. *See* R. 362–69 (Ex. B3E). It appears that Jill lived near Samantha in Iowa around this time and saw her several times every week. *See* R. 369–70, 378–79, 398. She reported that Samantha "cannot move around well," R. 363, or "stand long" because of "constant pain & swelling" in her lower extremities. R. 362. Samantha did "as much as she can" to care for her children, but Jill did "most of her grocery shopping" and drove them to appointments. R. 363. She estimated that Samantha went to the grocery store "maybe once a month" and noted that she used a motorized cart when she went. R. 365. Jill reported that Samantha made "sandwiches [or] frozen pizza" for the family to eat every

14

day, but that "her 12 year old help[ed] a lot" and Samantha had "to take a lot of breaks." R. 364. Samantha did "some laundry, but [her] kids help[ed] a lot" with that, too. *Id.*

In August 2019, Samantha told Ashely Freeman, Ph.D., that her life "just spiraled the last few years since [she] broke [her] ankle." R. 579 (Ex. B6F). She gained 150 pounds when she "couldn't walk for nine months." *Id.* She "still ha[d] a lot of issues with" her ankle, including that it "swells 24/7." R. 578. Samantha enjoyed spending time at home with her kids and talking to her friends. R. 579. She reported that she could "prepare a simple meal" and noted that she "cook[ed] all the time" and was "teaching the kids how to cook" because it was "one of the things [she's] able to do with them" despite her medical conditions and symptoms. R. 581 ("I don't have to leave the house to do it."). She could not shop alone. *Id.* Her "mom and oldest [child] typically go and [she] stay[s] home." *Id.* Samantha reported that "[s]he can maintain the home," but she did not identify any household tasks other than doing "her own laundry." *Id.* She did not say how often she did laundry or how long it usually took her to finish that chore.

Jill submitted a second Third-Party AFR in November 2019. R. 398–405 (Ex. B8E). She had moved to Florida by this time, R. 405, so she no longer saw Samantha "several times a week" like when she did Samantha's grocery shopping for her, R. 398, 401. As far as Jill was aware, Samantha's kids still "help[ed] her a lot" around the house, R. 399, including by doing "most of the cleaning," R. 400. Samantha "used to love cooking," but now she made only "simple things in [a] crock pot or pasta" and her "oldest son help[ed] her with cooking." R. 400. Samantha also submitted a second AFR in February 2020. *See* R. 407–14 (Ex. B9E). She had "constant nerve pain" in both legs and feet. R. 407. She "put her ankle up 7–10 times a day to reduce swelling." *Id.* On an ordinary day, Samantha took her medications, packed her four-year-old child's breakfast, soaked her feet in Epsom salt solution, iced her ankle, and napped until her

15

thirteen-year-old son got home and "takes over for dinner." R. 408. Her thirteen-year-old did the cooking and her other kids pitched in by doing chores and helping Samantha care for their "very independent" four-year-old sibling. *Id.* Samantha spent about an hour cooking "complete meals" a few times a week, but she "rarely [did] it without help." R. 409. She could also "fold[] laundry, clean[], [and] vacuum," but she had "to break up any chores . . . to stop and rest [her] nerves." R. She did all her shopping online so she could "order [something] and just pick it up" at the store or have it delivered to her house. R. 410. She did not go anywhere on a regular basis. R. 411. When she did leave her house, she "need[ed] someone" with her in case she needed help. *Id.*

In March 2021, Samantha testified by telephone at a hearing before ALJ Gordon. She had "severe nerve pain all day, every day," and it was now to the point that it felt like "walking on glass." R. 75. Her ankle swelled "very consistent[ly]," if not "daily," R. 76, and she kept it elevated "at least half of [her] day," R. 75, by lying flat on her back with her foot above her heart, R. 76. Samantha lived alone with her children—ages five, nine (twins), twelve, and fourteen, R. 71–72, some of whom had their own medical conditions, R. 78 ("My 14 year old has PTSD. My 12 year old has ADHD and GMDD, and my five year old daughter has kidney issues."). The children did "the majority" of household chores, including cleaning, R. 78, the family's apartment, R. 71. *See* R. 78 ("My 14 year old[,] regardless of his mental health, he tends to do a lot around the house."). Her friend also "help[ed] with the kids" and went grocery shopping when necessary. R. 77; *see also* R. 82. Samantha last went to the grocery store a week before the hearing. R. 78. Her oldest son went with her, as he "typically" did, because she could not go alone. *Id.*

ALJ Gordon summarized some of this evidence in his written decision. *See* R. 39–43, 47. He found that Samantha's MDIs "could reasonably be expected to cause some of [her] alleged

16

symptoms," but that her statements describing "the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [his] decision." R. 46. First, "the objective medical findings of record failed to support [her] allegations of disabling symptoms and limitations," R. 46, although her "pain allegations [as to] walking/standing" did justify "limit[ing] her to sedentary tasks," R. 48 ("In considering the claimant's pain allegations walking/standing, the [ALJ] has limited her to sedentary tasks."). ALJ Gordon appears to have rejected Samantha's "allegations of needing to elevate her feet," R. 42, specifically because he found them "inconsistent with" evidence that Samantha exhibited "no edema on exam" during a telehealth encounter March 2021. R. 42 (citing R. 1339). He did not mention that Dr. Weresh told Samantha to elevate her ankle to help manage pain and swelling after all four of her surgeries, *see e.g.*, R. 609, 611, 613, 617, 619, 629, 638–39, 641–42, 644. See *Arakas*, 983 F.3d at 98 ("In evaluating a disability claim, an ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.") (cleaned up).

Second, ALJ Gordon rejected Samantha's and Jill's statements to the agency describing her extremely limited daily activities, as well as her reliance on friends and family to complete most daily tasks, R. 47–48 (citing Exs. B3E, B8E, B9E, testimony), because those allegations were "[s]omewhat inconsistent with" evidence that Samantha "reported intact daily activities, including cooking and teaching her kids to cook, doing laundry, cleaning her home, and independently managing personal care tasks" during the consultative exam in August 2019. R. 47 (citing Ex. B6F). In his view, Samantha "admitted to greater abilities" at that exam than what she and Jill described in their contemporaneous reports to the agency. R. 48 (same). ALJ Gordon

17

also appears to have rejected as implausible Samantha's purported testimony that her children "did *all* the household chores" even though they had "various mental and health issues" of their own. R. 39 (emphasis added).

In August 2019, Samantha told Dr. Freeman that she could "prepare a *simple* meal." R. 581 (emphasis added). She "cook[ed] all the time" and was "teaching the kids how to cook" because it was "one of the things [she's] able to do with them" despite her medical conditions and symptoms. *Id.* ("I don't have to leave the house to do it."). Samantha reported that "[s]he can *maintain* the home," but she did not identify any household cleaning tasks other than doing "her own laundry." *Id.* (emphasis added). She did not say how often she did laundry or how long it usually took her to finish that chore. *See id.* ALJ Gordon's conclusion that Samantha reported "intact daily activities including cooking and teaching her kids to cook, doing laundry, [and] cleaning her home," R. 47, "did not acknowledge the limited extent of those activities" as Samantha described them to Dr. Freeman, *Brown*, 873 F.3d at 269. As noted, "[a]n ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them. [ALJ Gordon] did just that." *Woods*, 888 F.3d at 694.

ALJ Gordon also failed to explain how he concluded that Samantha's statements to Dr. Freeman were "somewhat inconsistent with" and demonstrated "greater abilities" than her and Jill's reports, R. 47–48, that she could cook simple and complete meals and do some routine household chores, but she had to take multiple breaks and relied heavily on family and friends to maintain her home and do the shopping, *see* R. 77–78, 82, 362–69, 372–78, 398–405, 407–14. "This conclusion was not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two." *Hines*, 453 F.3d at 565. Moreover, Samantha's testimony that her five children did "*the majority* of" the housecleaning, R. 78

18

(emphasis added), was unrebutted. ALJ Gordon did not cite any evidence justifying his apparent skepticism of that testimony. R. 39. "The deference accorded an ALJ's findings of fact does not mean that [courts] credit even those findings contradicted by undisputed evidence." *Hines*, 453 F.3d at 566. Finally, ALJ Gordon never explained how Samantha's ability to cook simple meals, teach her kids to cook at home, tend to her own personal care, and do some basic household chores like washing the laundry—which Samantha did on her own schedule and with significant help from friends and family—supported his finding that Samantha could sustain a full-time job outside the home. *See Brown*, 873 F.3d at 269–70. These are clear legal errors. *See id.*

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's motion for summary judgment, ECF No. 14; **DENY** the Commissioner's motion for summary judgment, ECF No. 17; **REVERSE** the Commissioner's final decisions denying Samantha's DIB and SSI claims; and **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g).

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to the parties.

ENTER: December 29, 2022

*[signature]*

Joel C. Hoppe
U.S. Magistrate Judge

20